Mr. Alford, we'd be happy to hear from you in this second case. Yes, sir. Please proceed when you're ready. So, yes, sir. Good morning. My name is Gregory Alford. I represent the Appellants, ContraVest Instruction, and Plantation Point Homeowners Association. We are here because of the Erie Doctrine, essentially, and that the District Court did not apply South Carolina's insurance law, nor its damages law, in light of the fact that there was a finding of primary face and bad faith. When bad faith exists, as this Court, respectfully, has held in Smith v. Maryland Casual Company, 742, that second before cert case in 1984, this Court held that when there's some evidence of bad faith, a jury has to decide. Unfortunately, the District Court kind of went with the hit Stonehenge finding, which is purely a contract or indemnity matter, and the finding was that under those, under that line of cases, and it, respectfully, the District Court ignored his own finding of bad faith, which in one of his, in his order, affirming the magistrate, the District Court said a jury should decide because there was a prima facie finding of bad faith. So, with that background, it's interesting because South Carolina... Mr. Alford, Mr. Alford, excuse me. So, with respect to this prima facie finding of bad faith, that was done, or that decision was reached in the context of this question of privilege, right? And the scope of privilege, isn't that right? Respectfully, not exactly, Your Honor. The magistrate did a report, did the R&R, and as that came up, it was, it certainly got its most focus in that context, but that, when that, when it was looked at, when that conduct was looked at, there was the finding of prima facie bad faith, and they went into an explanation. I'm happy to discuss it with the court. Certainly, the District Court could certainly change its mind about that finding and determine, based on the summary judgment record, that, in fact, there was no evidence of, no prima facie evidence of bad faith. They could, Your Honor, but that did not occur in this case, in either of the orders. But that, he never dealt with that. But I had the same question as my colleague, and the broader question I have is, this circuit has been very emphatic in saying that a breach of contract action doesn't routinely turn into a court, because people seek the contract in order to gain a certain predictability and certainty in their future commercial relationship. And if you turn breach of contract actions, even in the insurance context, into courts, the court actions have wide-open damages. They're much more wide-open than contract actions. And if you have these bad faith actions going along all the time, premiums are going to rise sky-high. They're going to go through the roof. And I just think that this court's historic position that breach of contract are not courts, presumptively not courts, unless you have, as the District Court pointed out, some very specific criteria that are met. Yes, sir. I'm sorry. No, I mean, it seems to me that we've got a lot of different parts to come and a lot of different criteria that will come, but starting, as is the line in this court's precedence, is that contract actions are not presumptively court acts. And I would agree with the court, Your Honor. And in fact, Stonehenge looked at that. Stonehenge did an excellent job of looking at that. In the Stonehenge case, the court looked at it, and a defense was raised, the prior knowledge defense. And the court said, you know what? That's not bad faith, because that was a valid, insurers have an absolute right to raise valid knowledge defenses. The problem that the District Court judge had, frankly, the problem that we had throughout the case was, before this case started, was the insurance carrier, Mount Holly, took a position for years as the underlying coverage was eroded. Then they changed that position when the underlying coverage got eroded, and there's evidence in the record of that. In fact, that was the ultimate finding of the District Court, and he says, ultimately, the court recognized competing inferences and competing deterrent prima facie, sufficient evidence has been introduced to warrant submission to the jury of the issue, which it's corrected. The problem that the court had, and I agree with you, Judge, we can't open the floodgates. I'm not advocating opening the floodgates. Well, but that's the very thing you're trying to do. Respectfully, Your Honor, I'm not. What I'm suggesting... Because you're proceeding in the face of a no-action clause, and that is that the insurer's obligation to pay must proceed from a judgment or a settlement, and there's no... This is the whole no-action clause, and it's found in a great many excess insurance policies, because many times, an excess insurer is not on the ground floor when settlements and the like are reached, and so what an excess insurer tries to do very often is say, look, if you want to go after us, you at least have to tell us what the trial judgment is or what the settlement amount is, but we have to know what we're supposed to pay before you try to put us on the hook for not paying whatever it is. And I could not agree with you more, Your Honor. In fact, that's where the district court and the magistrate found the bad faith was in that back and forth between the insured and Mount Holly. That was going back and very day of trial. A letter came from Mount Holly the very day of trial saying, don't you guys try to settle. They participated only to settle. No, but none of this is convincing me that you're not trying to initiate the effect of these no-action clauses in excess insurance policies, and the effect of that would be absolutely huge. Well, Your Honor, I'm not trying to break down that wall. I'm not asking the court to do that on the facts of this case. I would submit to you this is a fact-specific matter where you had exhaustion of all the underlying coverage, and Mount Holly was aware of the exhaustion. So what were they supposed to do? They didn't know what the judgment was. There was no judgment that told them how much they were supposed to pay. There was no settlement that told them how much they were supposed to pay. They were supposed to get into it. They were supposed to be reached with their consent. It never was reached with any consent as far as they still haven't been informed of what their obligations even are. I'm sorry, Your Honor. Respectfully, the record that they were involved in the conversation the entire time and communicating back and forth up until the very day of trial. At trial, a settlement was reached. They were offered the opportunity, and they failed to participate. Let me just say this, Your Honor. I respectfully, in South Carolina law, in the N. Ray Mount Holly opinion, and I know that was about the attorney-client issue, but in the context, they said in a bad-faith context in South Carolina, the tort and the contract claim were recognized in South Carolina. So I'm not asking the court to close the gates all over the United States, but South Carolina is very insured, and this is a fact-specific case. Your Honor, I would respectfully disagree with you that they were not informed of what was going on up to the minute. Whenever somebody's going against a considerable body of law, they always refer to it as a very fact-specific case. I don't blame you, but that doesn't lessen for me the significance of what you're trying to do. But, Your Honor, what I'm really not doing is that, because I would like for the court to go with the Smith opinion that came from this court because of that fact difference, both in Hitt and Stonehenge. I understand the court's policy concerns. I truly do. But consider this for a moment. In this case, there's a prima facie finding of bad-faith conduct on the way the claims came, the letters that were coming in, the things that they were saying, and how they changed their positions while their policies were not, quote, on the front line. That's not one of theirs. We need something better because our policies are now on the front line when a decision came down. And this will be the first time this court has looked at this across the movement. But what I'm saying to you is, if there's a finding of bad-faith, I don't think every case should be a bad-faith case. If a carrier has a perfect right to say, especially in a no-action case, I'm not doing anything. That's the point of the case. How did you suffer, counsel, how did you suffer any damages on this? Because the district court made a point of stating the Hornbook proposition of South Carolina law, which is that you have to have some kind of consequential damages. And you made this voluntary confessional judgment. But, you know, that didn't cost you a single penny. And, Your Honor, what I received was this. Because you were bankrupt or defunct. I was not bankrupt. You confessed, voluntary confessed to judgment, but you confessed to a judgment you would never have to pay. If I may, Your Honor. That's really odd. Well, may I tell you what happens to the entities that are in that position? They're trying, don't, and even under Stone and Enstrom, in this case, to go back into the contract point, simply because $3.3 million was paid because this defunct entity had purchased insurance. People purchase insurance. It's an asset. And I think what the court is saying, I understand. Does your client pay anything? The insurance paid, yeah, paid premiums for insurance. Did your clients pay anything as a result of the confession of judgment? They didn't have anything to pay. They were, they didn't have any. And then I think that's where the court's not applying South Carolina law, respectively. Because, and we cited the law in our memorandum. South Carolina law says that the judgment. This is only one of many problems with your particular position. The district judge is plenty familiar with South Carolina law. You've seen a lot of these cases come down the problem. With all respect to you, this one seemed to me to be particularly problematic on the different fronts that I've tried to identify. Your Honor, can I address your damages question briefly? One of the fundamental tenants in South Carolina law, and it's been cited by the district court, is where a wrongdoer creates a situation that makes proof of exact amount of damages difficult. Juries are allowed to act on probable and inferential as well as direct positive proof. The district court adopted- But Mr. Alford, you don't, Mr. Alford, you don't get to a jury unless you have some evidence of damage. I mean, it's true that a jury can infer from the facts the full extent of the damages. And ultimately, a damage award is in the discretion of the jury. But there's got to be some evidence of damage. Although I will say this, I wonder, and this wasn't raised by anybody, most jurisdictions, and I think South Carolina is among them, would allow an award of nominal damages even in the absence of actual damages. And that allowed the case to go to a jury on the question of punitive damages. But that, I mean, that never came up. And I wonder what your position is about that. And that's exactly correct, Your Honor. In fact, there are a number of things that could be construed as damages under South Carolina law. And we talked to the court about it. And considering we have a much relaxed- Did you talk to the court about nominal damages? Yes, sir. We talked on the record about all types of damages. In fact, one of the positions that we discussed with them was, I'm sorry, Your Honor, I just want to say, was that the damages are, just bear with me one second, Your Honor, you've got reputational damage. The controversial entities still exist. And the gentleman testified, we don't want a judgment against us. We never had one. We'd like it taken. In construction cases, it's very- But it wasn't, Mr. Offit, it wasn't a judgment against them personally. It was, as Judge Wilkinson said, a judgment against a defunct corporate entity. I don't see what- Yes. How that would have any kind of reputational impact. Well, Your Honor, respectfully, because they carried on the name and their next, that's what they'll do, Contravest Inc., Contravest LLC. And they carry on because what happens is, once they're out of insurance, once their insurance assets are depleted, and I want to address one thing before,  and I'm afraid this happens a lot, please don't confuse never intending to pay anything with the inability to pay. They purchased insurance. They have a right to it. When you talk about damages, and we addressed this with the court, they paid premiums. They got nothing for it. Hundreds of thousands of dollars of premiums for these $20 million, $2, $10 million policies. They paid an attorney to fight for coverage, which they never got. Nominal damage is imputed damage. And I think that's the difference I'm trying to express to this court. South Carolina law says, and this court has recognized in the Smith-Merrill Caps case, if there's some bad faith, the jury gets to decide. Nominal damage is $1. All right, we thank you because we've been over that. The question is whether there was a tribal issue under these facts or not. But we appreciate it very much. And you have some, I'm going to ask my colleague, if they have questions. And you also have reserved some time for rebuttal, Mr. Alford, which you will have. Judge King, do you have some questions you'd like to ask of Mr. Alford? I do not, Your Honor. Judge Diaz? No, sir, thank you. All right. Thank you very much, Mr. Alford. And now let's, we look forward to hearing from Mr. Brown. Thank you, Your Honor. May it please the court. Mitch Brown from Mount Holly Insurance. This is an excess policy situation in which there is no duty to defend. That is expressly stated in this particular excess policy. Some excess policies, as the court knows, will say there's a duty to defend once there's an exhaustion or things like that. Other excess policies, like this one, simply say there is no duty to defend, period. And there's not. That has been upheld by various courts. This exact provision has been upheld by various courts and it's not challenged here. In addition, as Judge Wilkinson pointed out, there's a no action provision in this case. South Carolina Supreme Court in the case called Sexton, which is cited in our briefs, has specifically upheld that provision, which requires that there be a judgment after an actual trial, which did not occur here, or a settlement in which Mount Holly has the option to participate, which it had no, I'm sorry, in which Mount Holly agreed. The contract claims, and here, as the court knows, the appeal here relates only to the bad faith order of Judge Norton. He's already ruled that there is no basis for the contract claims to go forward. He's already ruled against the unjust enrichment claim and there's no appeal as to that either. So what we're left with is the argument of counsel that the implied covenant of good faith standing by itself somehow makes Mount Holly liable to pay this confession of judgment for $9 million that Mount Holly did not agree to. It does not have any duty to pay that for numerous reasons. My opponent tries to characterize this as some open-ended jury question that the jury can just come in and decide whatever damages they would like to assess based on the prima facie determination in a discovery order which has since been retracted by Judge Norton. As Judge Diaz, I think, was noting, the judge has all discretion to withdraw that prima facie or to simply disagree ultimately at the summary judgment stage with any finding of bad faith, which he did. In addition, the court found that there were no damages here. He gave the opposing counsel additional opportunities to present anything to the court that there was some damage of any kind whatsoever. And the only thing that the plaintiff presented was the confession of judgment. And the plaintiff said, this confession of judgment is the damage. That was the only argument advanced. The confession of judgment cannot be the damage because of the Stonehenge case and the Hitt v. Cox case. The confession of judgment is really, in essence, an attempt to set up the excess carrier, and really no less than that. It was not agreed to by Mount Holly. Mount Holly, in fact, never even got an opportunity to examine the proposed confession before it was entered into. Did I ask a question about the damages issue, which I asked Mr. Alford, because I think you would know a lot more about South Carolina law than I do. But is it correct that a case can't go to the jury in South Carolina on nominal damages alone, or do you have to make a fine showing of actual damages to get to a jury? Your Honor, in some cases, like a trespass case, you would have a nominal damage implied by law that would take that element and satisfy that element. In a case where the only thing that you're asserting, which is what, despite counsel's statement, to the contrary, he's doing, is an implied covenant of good faith in the absence of any deprival of any express contract benefit, the Tadlock v. Maryland Casualty Company case says you must prove consequential damages. That's what it requires. They didn't prove any consequential damages. They proved zero damages. And the only thing they continued to bring up was this very unfair confession of judgment. And they pointed to that. They raised various straw men, frankly, arguments like insolvent entities have a right to insurance. Of course they do. I mean, that's not the point. What the point here, Your Honor, is that in a setting where there were multiple defenses in this construction defect litigation, statute of limitations, statute of repose, the scope of repair damages was viewed as a $1.5 million scope of repair by all of the collective defendants, whereas the plaintiff viewed it as a $30 million case. Instead of going to the jury verdict and having an actual judgment after a trial, what happened here is the primary insurance companies and ContraVest and the Homeowner's Association all got together and they apportioned some monies between themselves. And then they said, let's do a confession of judgment where the only party that has to pay this money is Mount Holly Insurance, the access carrier. That is the case. Your Honor, to follow up on Judge Diaz's good question, with respect to the nominal damages, first of all, I don't think it was said here, but I think as I understand state law on this, it depends on the type of case. And you would have a, as I think Judge Diaz alluded to earlier, a better case that a nominal damage in a reputational damage setting and some instance where intangible damage was still damage you can understand. You know, you can sometimes nominal or intangible damage and so it would be damage. In the construction industry, it's different. What you guys are interested in is the bottom line and you deal in pretty big sums and nominal damages just isn't the kind of issue in a construction puzzle as it is in some other instances where there's an imbalance of power or where somebody is being hurt in an intangible but yet still meaningful way. But I would think construction, you know, you folks deal with big sums. I don't think you're interested in $1 amounts, but a different kind of case might present a different sort of question, don't you think? Yes, Your Honor, I do. Potentially, it might. Not here. Here, the plaintiff was afforded each and every opportunity, multiple opportunities by the district judge to specify what his damages were. And the only thing he pointed to was the confession of judgment, which, as I've stated, is also unenforceable against Mount Holly. That's the other kind of it's related but separate reason why this confession of judgment cannot be made payable by, you know, in favor of the plaintiff is because of the Stonehenge case and it is essentially a setup of the excess carry. Mr. Brown, I'm wondering if it wouldn't be best now for me to ask my fine colleagues if they had some questions on it for you. Otherwise, I think we understand your argument both of them in the brief. But I'm going to ask my friend, Judge King, if he has some questions for you. Judge King? I'm fine. Thank you, Your Honor. All right. I'm going to ask Judge Diaz if he has some questions for you at this point. I do not. Thank you. All right. Well, I have no further questions for you either. Thank you, Your Honor. Thank you very much. And Mr. Alfred, you have some time to rebut what Mr. Brown has said. We'd be happy to hear from you on that. I'm sorry, Your Honor. I had to unmute the microphone. I probably need all the time I can get based on the first round. But I'll say this. First things first. The problem with what's happening here, and you're right, we do deal with big dollars. In this case, over $14 million were paid from the various subcontractors. And I will say this. It isn't the fact that the dollar amount of the judgment that Mount Holly's liable for. What they're liable for is the fact that they made, they're insured, they acted in bad faith. I mean, court found they did. The court has never taken that finding back anywhere in the record. They acted in bad faith and made them sign a judgment. I mean, they have a choice. Otherwise, all of the entities would have been had to go to trial. Secondly, even under Stonehenge, Your Honor, $3.3 million was paid on behalf of, by not just underlying carriers, but also two excess carriers. Crown enforcers are paid as an excess to generate that $3.3 million. So under Stonehenge, it should go back for some amount of allocation. And that really should be done under the New Crossman analysis, which directly says that it either falls, footnote 15, New Crossman should be important to this court because what it says is that it falls in the years, the way the years go in the coverage. If there's a year where the underlying coverage is exhausted, it either falls on the excess carrier or if there's no excess insurance, falls on the insurer. Well, guess what? There's $20 million, $10 million a year of excess. And the court asked this question, well, people are gonna be giving away money. And I agree, you shouldn't be able to set up a carrier to sign judgments. That defendant, not with my help, did what they thought was prudent to get out of the case. At that point, their case is done, except for this piece, because what did they buy from Mount Holloway? The problem with what this court would respect, the problem with the position where we're gonna end up policy-wise, okay, in the big picture is, this decision encourages excess carriers with no action clauses to act in bad faith, because they're getting away with something that South Carolina law says you cannot do. And respectfully, under the Erie Doctrine, this court- The South Carolina courts have upheld these no action clauses, Mr. Offit. Yes, sir, they have, but not where there's been bad faith, not where there's been a prima facie finding of bad faith. I mean, that's- But that's assuming the conclusion. I mean, you were pointing to these no action clauses as some kind of prima facie evidence of bad faith, and the South Carolina courts have upheld them. I'm all for a no action clause, and I think it's legitimate, but that doesn't remove the obligations in statute and in the Tiger River Doctrine, which is still law in South Carolina, doesn't remove the obligation for the carrier to at least participate in good faith or at least play along. They don't have to defend, and they don't have to indemnify. They're allowed to have their contractual defenses. I'm not against a no action clause. What I'm against, and what we're advocating against here, is a policy that would allow a no action clause to allow bad faith conduct to occur. And it's fine if they have a no action clause and say, hey, we're not getting involved, and we're not paying. But what you have here is a prima facie finding of bad faith early in the case, and they did. I mean, it's just, read the letters. And tell me again what that is premised on, Mr. Alford, what the bad faith finding is premised on. Your Honor, what happens with these, if I may, so take a second, but what happens with these construction claims is under Crossman, which is our paradigm to resolve progressive damage funds, the South Carolina court adopted Crossman. So if there's 10 years of coverage, they'll say, okay, year one, year two, year three, year four, year five, and you go down the list. In the year that this coverage got exhausted because the company kept getting sued, okay? And finally, when they only had this little bit of coverage left, one, two years got exhausted, and there's an email. There's an email from one of the adjusters to another adjuster saying, well, we better have more than this other provision to rely on because our policies are gonna be on the front line. Up until that time, over the series of lawsuits that had taken place to erode 13 years, 14 years of substantial insurance coverage, underlying coverage, you're talking millions in the underlying years were eroded. When they found out all of the years when their policies weren't even close to being accessed, they did a follow form letter saying, okay, we got it. You know, we received notice of the suit. Here's our defense, you know. You know, if you have these sorts of problems, people think that, oh, you have to reform the entire insurance industry with one of these bad faith lawsuits. You know, there's always the insurance commissioner and there's always the state legislature to go and you see some sort of systemic problem. It's not clear to me that we're the ones to be particularly in a federal court on trying to reform South Carolina law. And your honor, I'm not asking you to. They changed their position and started asserting new defenses that they admitted in their pleadings later were not correct. And that's what offended the magistrate and that's what offended her in her findings because of the facts of bad faith. I'm not asking you to reform the system. We're looking at the district court's judgment and in any event, Mr. Alford, your time has expired and I always like to give my colleagues a chance to ask you any questions if they have. Judge King, do you have some questions? I'm satisfied, your honor. All right. Judge Diaz, are you okay? Do you have some questions? I do not have further questions. Thank you. All right. Mr. Alford, Mr. Brown, I want to thank you both for your arguments. I'm sorry we can't come down and shake your hands the way the Fourth Circuit traditionally does. But we regret and you understand why that's so. Sir, thank you. So we wish you both a nice afternoon and thank you so much. I'll ask the courtroom deputy please to adjourn court. Yes, sir. Thank you, your honor. Thank you, your honor. This honorable court stands adjourned. God save the United States and this honorable court.
judges: J. Harvie Wilkinson III, Robert B. King, Albert Diaz